[Cite as *State v. Carmichael*, 2017-Ohio-8904.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-1 |
| | : | |
| v. | : | Trial Court Case No. 16-CR-451 |
| | : | |
| ADAM CARMICHAEL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of December, 2017.

. . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, 4th Floor, Springfield, Ohio 45501
    Attorney for Plaintiff-Appellee

JOSHUA M. KIN, Atty. Reg. No. 0086965, 220 West Sandusky Street, Findlay, Ohio 45840
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, P.J.

{¶ 1} Appellant was indicted on September 12, 2016 for one count of Domestic Violence (R.C. 2919.25(A)), a third-degree felony due to three referenced prior domestic violence convictions; one count of Abduction (R.C. 2905.02(A)(2)), a third-degree felony; and obstructing official business (R.C. 2921.31), a fifth-degree felony. After a jury trial where the trial court granted a Crim. R. 29 motion with respect to the obstructing charge, Adam Carmichael was found guilty of Domestic Violence and Abduction. On December 19, 2016, Appellant was sentenced to maximum prison terms of three years for each offense to be served consecutively for an aggregate sentence of six years.

{¶ 2} Appellate counsel filed a brief under *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), asserting the absence of any non-frivolous issues for our review. We informed Carmichael of the *Anders* filing and advised him of his right to file his own brief and the time limit for doing so. Adams has not filed a pro se brief, and the time for filing has expired.

### Four independent eyewitnesses observed Domestic Violence.

{¶ 3} On August 4, 2016 Officer Meredith Freeman of the Springfield police department was patrolling the streets of Springfield around 10:30 PM when she drove past Adam and Kristina Carmichael. Officer Steve Henson was in the same area because both officers had been dispatched to an unrelated call. Kristina yelled out, "Help," as the officers drove past the Carmichaels. (Trial Tr. 119:20-24). Officers Freeman and Henson both turned around and contacted the couple. Kristina "didn't really want to talk to [Officer Freeman]," but said "she just wanted to go home." (Trial Tr. 120:1-6). Kristina did not have any injuries at that time. (Trial Tr. 120:7-23). The officers then left the scene and

proceeded to the call on which they had been dispatched. (Trial Tr. 121:1-3).

{¶ 4} Four independent witnesses testified to what next occurred. Jacob and Brittany Macy were Pokemon hunting near midnight in the vicinity of Wittenberg and Columbia Streets in the company of their friend Ashley Mapes. Mapes, although with her friends, was not Pokemon hunting. They encountered Adam Carmichael and his wife, Kristina Carmichael. (Trial Tr. 70:4-5; 77:11-15; 85:2-5; 94:20-95:2; 99:20-100:2). Jacob recalls seeing Kristina walking "pretty fast" and then Adam "chasing after her." (Trial Tr. 70:20-25). Brittany explained that she and Ashley had paused to take a picture of a spider on a lamppost, when Kristina walked past them with Adam following behind. (Trial Tr. 85:18-23).

{¶ 5} The Carmichaels sat on a bench approximately 50 feet away from Jacob. (Trial Tr. 71:4-9). Jacob explained that he "[c]ouldn't hear [the Carmichaels] word-for-word but…it was heated." (Trial Tr. 71:12-16).  Jacob then saw Kristina get up from the bench and try to walk away from Adam. Adam stopped her a couple times before Kristina started walking down the street. (Trial Tr. 71:19-21). Kristina walked to the corner and Adam caught up to her. (Trial Tr. 72:1-3). Jacob was looking down at his phone when he heard Kristina "scream for help and start saying, 'Ow.' " (Trial Tr. 72:6-8). Jacob looked up from about a half-a-block to a full block away and saw Adam "picking [Kristina] up, slamming her on the ground, kicking her and hitting her when she tried to get up." (Trial Tr. 72:8-13).

{¶ 6} Brittany Macy admitted she did not see everything because, she explained, she did not wear her glasses and could not see that far away. (Trial Tr. 88:6-9). She did hear Kristina yell, "Help, he's hurting me." (Trial Tr. 87:16-19). And, she testified "he was

dragging her down the road." (*Id.*)

{¶ 7} Ashley recalled seeing Adam "putting his hands on [Kristina's] shoulders and picking her up, and then she was on the ground; the next thing I saw, and he was kicking her." (Trial Tr. 95:20-23). Ashley felt maybe she was about half-a-block away when she witnessed this. (Trial Tr. 96:2-6). Ashley identified Kristina's photo (Exhibit #4) as "[t]he lady that we seen that same night that was getting beat up." (Trial Tr. 97:7-8). She called 911, twice. (Trial Tr. 100:6-7). On cross, Ashley clarified that she did not see Adam throw Kristina to the ground: "Well, I looked up and I saw his hands on her, and then I grabbed my phone, and then I stood up, and [Kristina] was on the ground." (Trial Tr. 101:18-20). When asked if she saw Adam strike Kristina, Ashley explained: "He grabbed ahold of her, if that's the same thing." (Trial Tr. 106:20-24).

{¶ 8} John Bradenburg was a security officer at the nearby Ohio Valley Surgical Center who was outside his building to meet a pizza delivery man when he "heard a lady screaming in pain…she was screaming out." He looked over and saw Adam "grab [Kristina], pick her up and slam her on the ground, kick, punch." (Trial Tr. 109:5-9). He called 911. (Trial Tr. 109:20-21). There was no chance that Kristina had simply slipped, fallen or stumbled to the ground. (Trial Tr. 110:20-24).

{¶ 9} During the described melee, two unidentified males approached in a vehicle, parked their car, and started following the Carmichaels about 10 feet behind. (Trial Tr. 74:2-7). Jacob Macy stated that Adam "turned around and went to strike one of them, and the two guys started beating him up…" though Jacob later agreed that the men "jumped on" and "punched" Adam. (Trial Tr. 74:10-12; 80:8-11; 89:15-21). John Bradenburg corroborated that story: "Well, they crossed the street, was walking behind [Adam] and

[Kristina], and I don't know. He just turned around and punched one of them." (Trial Tr. 115:7-12). Bradenburg expanded: "Well, one of the guys got behind him after he punched the other one, kinda got him like in a choke hold and brought him to the ground and the guy punched him in the face a couple of times." (Trial Tr. 115:19-22). Ashley described this scene as Adam getting jumped by two men who beat Adam up. (Trial Tr. 103:3-11). Ashley also testified that Kristina was yelling, upset, and trying to protect her husband, Adam. (Trial Tr. 103:12-17).

{¶ 10} Neither Jacob, Brittany, nor Ashely saw the two men make any physical contact with Kristina during the altercation. (Trial Tr. 75:3-16; 89:15-90:5; 105:23-106:6). While the melee ensued, Jacob and his wife started talking to Kristina and tried to persuade her to get to safety. (Trial Tr. 74:10-14). She apparently did not leave with the Macys but tried to convince them "to tell the two guys that [Adam] learned his lesson, that he's had enough…" (Trial Tr. 74:14-16). Then, an unidentified man came out of a nearby tavern and fired a gun into the air, and the other two men then got back into their car and left the scene. (Trial Tr. 74:20-23). Shortly thereafter, the police arrived. (Trial Tr. 74:1-2).

**Appellant forcefully held his wife in front of him as a shield.**

{¶ 11} When Officers Freeman and Henson were dispatched to "a male and female fighting in the area," Officer Freeman surmised it was "gonna be the Carmichaels that we were just out with…" (Trial Tr. 112:10-17). Freeman approached the Carmichaels head-on and was the first to arrive on the scene -- she had exited her vehicle when Officer Henson arrived. (Trial Tr. 122:6-17). Officer Freeman was being cautious because of the report that shots had been fired. (Trial Tr. 122:21-25). When Freeman approached the Carmichaels, Adam had his shirt off and wrapped around his hand. (Trial Tr. 122:23-25).

Freeman thought there was something inside Adam's t-shirt, and she did not know if Adam had a gun. (Trial Tr. 123:1-4). The officer pulled her gun held at a "low ready" – with the muzzle of the gun pointing down and ordered Adam to drop his t-shirt and to show his hands. (Trial Tr. 123:5-12). "He started yelling, 'Shoot me, shoot me, b****, shoot me.' And then he…grabs [Kristina] by the neck and pulls her in front of him so it's like a shield. He's using his wife as a shield and—while he continues to yell, 'B****, shoot me. I don't care to die, shoot me, shoot me.' " (Trial Tr. 123:18-23; 143:6-10).

{¶ 12} Officer Freeman began closing the gap between herself and the Carmichaels while Appellant continued to hold his wife by the neck in front of him as a shield. (Trial Tr. 124:12-14). Officer Freeman yelled at Kristina: "Kristina, walk away. Mrs. Carmichael walk away." (Trial Tr. 124:14-16). Officer Freeman saw Kristina "trying to push off, and he was just steady holding her, fixated on me" and continuing to yell. (Trial Tr. 124:14-19). Eventually, Kristina was able to pull away from Adam, the t-shirt fell out of Adam's hand revealing him holding his flip-flop and Officer Henson tased him, but one of the electrodes missed. (Trial Tr. 125:1-8, 17-21). What resulted was a "full on fight" (Trial Tr. 126:23-25). Eventually, Deputy Matthew Yates of the Sheriff's Office joined Officers Freeman and Henson, Appellant was tased by Officer Freeman and they were able to get Adam handcuffed. (Trial Tr. 127:13-128:13).

## The victim denied domestic violence.

{¶ 13} Officer Freeman's attention turned to Kristina, and Freeman observed a big knot on her forehead, bruising on her neck consistent with being choked, a cut lip, and disheveled hair. (Trial Tr. 129:13-16). Kristina immediately told Officer Freeman that "nothing happened" and that "her and Adam was walking down the street, and that her

husband was jumped." (Trial Tr. 129:21-23). Kristina also explained that "They just came up and jumped him, and I tried to get in the middle and help." (Trial Tr. 130:1-3).

{¶ 14} Kristina Carmichael was called to testify at trial by the defense. She admitted she had been drinking earlier in the day and at some point she was arrested for OVI. (Trial Tr. 172:1-8). A police officer dropped Kristina off at her sister's house, and Adam walked over to that house. (Trial Tr. 172:10-14). Kristina expressed that Adam was mad that she received an OVI, but testified that they simply argued—she denies any domestic violence. (Trial Tr. 172:15-173:1). Adam and Kristina began walking home from her sister's house, and Kristina explained that "[a]s we was walking home, we argued all the way home pretty loud. Just kinda like—I was kinda fighting him off because I was mad, and he was drunk, and it just kept going on and on…" (Trial Tr. 173:3-8).

{¶ 15} Kristina recalled encountering Officer Freeman earlier in the night, but did not recall whether she yelled for help as Officer Freeman alleged: "Q. Had you been yelling out to them for help? A. No. I don't think I would. Maybe. Q. And why would you have done that? A. 'Cause when I'm drunk, I'm like that." (Trial Tr. 173:19-22). She adamantly denied domestic violence.

{¶ 16} Kristina explained that as they were walking she kept falling down and Adam kept picking her up. (Trial Tr. 174:23-25). She said "as he was picking me up, I kept pushing him off of me. And he was trying to get me back together because we was ready to go home and then I just—and two guys jumped out and started beating up my husband." (Trial Tr. 174:24-175:3). Kristina then described how she was injured that night: "They said, 'Get the f*** off of her, n*****.' * * * They just started beating him up, and I was like pushing 'em off and they're beating him up pretty bad, so I kicked the guy. I think I

kicked him in the head, I'm not too sure, but he swung on me and punched me in my face." (Trial Tr. 175:7-13).

{¶ 17} When pressed on whether Adam threw her to the ground, Kristina responded: "No. I fell to the ground. My husband was picking me up off the ground. I was fighting my husband off, like 'get off of me. Get off of me. I don't feel like doing this right now,' basically." (Trial Tr. 175:14-20). Kristina categorically denied being struck by Adam. (Trial Tr. 175:21-24; 176:19-25; 180:3-14). Again when asked how she was injured she explained: "One from the white guy beating him up, and the others—The ones with the neck scratch right here [referring to exhibit], this is from my sister when we got into an argument when I came with the police officer because she was mad at me, and we tumbled for a little bit." (Trial Tr. 176:14-18). She said the police never asked for a description of the men who attacked Adam or took pictures of Adam's injuries. (Trial Tr. 178:16-22; 179:6-16).

{¶ 18} At one point in her testimony, Kristina said that after the police arrived her husband was not holding her against her will or preventing her from going where she wanted to go. (Trial Tr. 177:20-25). But the questions and answers for this inquiry were not specifically directed or related to the Appellant's holding of Kristina by the neck and using her as a shield.

{¶ 19} Finally, upon cross examination Kristina denied that she was afraid of the defendant or that she had ever said she was afraid of him. After that testimony and a sidebar, the State was permitted to briefly question Kristina about her report to the police of domestic violence in May of 2016 where she told the police she was afraid of her husband. Based on her report at that time, a domestic violence charge was filed but the

case was later dismissed when she refused to participate in the prosecution. (Trial Tr. 191).

**The trial court considered statutory factors and the appellant's record**

{¶ 20} At sentencing the trial court indicated it considered the presentence investigation report that had been prepared and which has been submitted to supplement our record. The presentence investigation report demonstrates Carmichael actually has four prior Domestic Violence convictions, two of which were felonies. He served separate prison terms for those felony convictions and served prison terms of 2 years for Robbery in 2004 and five years for Involuntary Manslaughter in 2006. He also has several misdemeanor convictions.

{¶ 21} Carmichael was sentenced to two three-year terms and the trial court verbally made the R.C. 2929.14(C)(4) findings to support consecutive sentences. The Judgment Entry of Conviction (Doc. # 18) indicates that the trial court considered the purposes and principles of sentencing in R.C. 2929.11 and balanced the seriousness and recidivisim factors in R.C. 2929.12. The entry also contains the consecutive sentencing findings that had been made at the sentencing hearing.

**Potential Assignments of Error**

{¶ 22} In the *Anders* brief, appointed appellate counsel asks us to review two potential assignments of error but does not present any analysis of them. They are (a) "[w]hether the Trial Court erred in overruling Appellant's motion for acquittal pursuant to Crim. R. 29 and whether the trial court's decision was against the manifest weight of the evidence" and (b) "[w]hether the trial court's sentence was clearly and convincingly contrary to law."

{¶ 23} We perceive the first potential assignment of error to be whether the convictions are supported by sufficient evidence and whether the jury's verdicts, as opposed to the trial court's decision, are against the manifest weight of the evidence. For purposes of this case we note:

> "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP–881, 2011–Ohio–3161, ¶ 11. Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP–725, 2005–Ohio–2198, ¶ 15.

*State v. Baum*, 2d Dist. Montgomery No. 27190, 2017-Ohio-981, ¶ 14.

{¶ 24} To analyze manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In addition, in a manifest weight analysis we defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶ 25} On this record, an argument that the convictions are against the manifest weight of the evidence is frivolous. With regard to the domestic violence, the evidence is overwhelming that Kristina was repeatedly assaulted and injured by her husband. Despite her denials, which even from our review of only a written transcript we view as unworthy of belief, the evidence so clearly supports that verdict that an argument that the weight of the evidence is contrary to the verdict has no arguable merit. Moreover, with regard to the abduction, there is actually no testimony contradicting the two police officers who said Carmichael forcefully grabbed Kristina by the neck and held her in front of him as a shield while challenging the officers to shoot him. A manifest weight argument to the contrary does not have arguable merit.

{¶ 26} The second potential assignment of error, that the sentence is contrary to law, is frivolous because it has no support in the record. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Marcum*, 146 Ohio St.3d 516, 2016–Ohio–1002, 59 N.E.3d 1231, ¶ 9. Here the appellant has convictions and prison sentences for four separate prior offenses of violence, let alone multiple domestic violence convictions. The trial court made the statutorily required findings for consecutive sentences at the sentencing hearing, included them in the sentencing entry, and it had no obligation to state the reasons for the findings. *State v. Bonnell*, 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.3d 659, syllabus. The sentences are within the statutory ranges for the respective offenses. "[A] trial court has full discretion to impose any sentence within the authorized statutory range,

and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." (Citation omitted.) *State v. King*, 2013–Ohio–2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). We agree with counsel that an argument that the sentences are clearly and convincingly unsupported by the record has no arguable merit.

### *Anders* Review

**{¶ 27}** We also performed our duty under *Anders* to conduct an independent review of the record. We thoroughly reviewed the docket, the various filings, the written transcripts, including the jury trial and the sentencing disposition. We found no non-frivolous issues for review. Accordingly, the judgment of the Clark County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Andrew P. Pickering
Adam Carmichael
Joshua M. Kin
Hon. Douglas M. Rastatter